IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| WILLIAM DAVID LEAK, M.D., et al., | : |
| | :    Case No. 2:07-cv-997 |
| Plaintiffs, | |
| | :    Judge Holschuh |
| v. | |
| | :    Magistrate Judge Abel |
| LEXINGTON INSURANCE CO., et al., | : |
| Defendants. | : |

## MEMORANDUM OPINION & ORDER

William Leak, M.D. and Pain Control Consultants, Inc. filed suit against Lexington Insurance Company ("Lexington") and Red Mountain Casualty Insurance Company ("Red Mountain") seeking an order declaring that Defendants were obligated to defend and indemnify Plaintiffs in a medical malpractice action filed by Karen Baugh-Ross. This matter is currently before the Court on several pending motions: (1) Red Mountain's motion for summary judgment; (2) Lexington's motion to deem requests for admission propounded on Plaintiffs admitted; (3) Lexington's motion for summary judgment; and (4) Plaintiffs' motion for leave to file discovery responses.

### I.     Background and Procedural History

The relevant facts in this case are largely undisputed. William David Leak, M.D. is a licensed physician. While he was employed by his professional corporation, Pain Control Consultants, Inc. ("PCCI"), Dr. Leak provided medical care to Karen Baugh-Ross. On December 10, 2004, Baugh-Ross reported to Dr. Leak's office to undergo a procedure designed to relieve chronic pain, but because her EKG was abnormal, he canceled the procedure and had

her transported to the hospital. He did not see her again.

On November 25, 2005, Baugh-Ross mailed "180-day letters" to Dr. Leak and to PCCI via certified mail.[1] Dr. Leak's wife, Melanie, who is also an employee of PCCI and its Vice President, certified receipt of both letters on November 28, 2005. (Exs. 4 and 5 to Lexington's Mot. Summ. J.; Melanie Leak Dep. at 9; Ex. 6 to Lexington's Mot. Summ. J.). She placed the letters on Dr. Leak's desk but did not specifically bring them to his attention. (Melanie Leak Dep. at 10-11). Dr. Leak does not recall receiving them. (Dr. Leak Dep. at 32-33; Ex. D to Red Mountain's Mot. Summ. J.).

On May 9, 2006, Baugh-Ross filed a medical malpractice action against Dr. Leak and PCCI ("the underlying suit"). Dr. Leak and PCCI then notified Red Mountain and Lexington, their professional liability insurance carriers, of the underlying suit. Both insurance companies, however, have refused to defend or indemnify Dr. Leak and PCCI. Red Mountain argues that because Dr. Leak and PCCI failed to report Baugh-Ross's potential claim within 30 days of being served with the 180-day letters, and failed to report the "professional incident" during the policy period, no coverage exists and Red Mountain has no duty to defend or indemnify. In a similar vein, Lexington argues that because Dr. Leak and PCCI knew of Baugh-Ross's potential claim prior to purchasing the insurance policy and failed to disclose it, no coverage exists and Lexington has no duty to defend or indemnify.

---

[1] In Ohio, medical malpractice actions must be filed within one year after the cause of action accrues. Ohio Revised Code § 2305.113(A). However, if, within the statute of limitations period, a claimant gives written notice to the potential defendant that the claimant is considering bringing an action, that time period may be extended by 180 days. Ohio Revised Code § 2305.113(B)(1).

2

On September 5, 2007, Dr. Leak and PCCI filed suit in the Franklin County Court of Common Pleas against Lexington and Red Mountain seeking an order declaring that Red Mountain and Lexington are obligated to defend and indemnify in the underlying suit. Plaintiffs also seek money damages. Defendants removed the case to federal court on the basis of diversity jurisdiction, and have now moved for summary judgment.

## II. Evidentiary Motions

Before reaching the merits of the summary judgment motions, the Court must rule on two pending evidentiary motions. On May 11, 2009, pursuant to Federal Rule of Civil Procedure 36, Lexington moved for an order deeming admitted its First Set of Requests for Admission. The Rule states that "[a] matter is deemed admitted unless, within 30 days after being served, the party to whom the request is directed serves on the requesting party a written answer or objection addressed to the matter and signed by the party or its attorney." Fed. R. Civ. P. 36(a)(3). Lexington served its First Set of Requests for Admission on Plaintiffs on February 27, 2009. Plaintiffs did not answer or object within the time allotted and did not move for an extension of time. Lexington therefore moves to deem admitted the First Set of Requests for Admission.

On June 5, 2009, Plaintiffs' counsel requested additional time to respond to all pending motions based on the fact that he was unexpectedly forced to relocate his office. For the same reason, he opposed Lexington's motion regarding the requests for admission. On June 9, 2009, Plaintiffs served on opposing counsel responses to Lexington's request for admissions and Lexington's request for production of documents. Plaintiffs also moved for leave to respond to discovery out of rule. Plaintiffs conceded that the responses were late and that the matters were deemed admitted, but asked the Court to exercise its discretion under Federal Rule of Civil

Procedure 36(b) to permit the admissions to be withdrawn. The relevant subsection of that Rule states:

> A matter admitted under this rule is conclusively established unless the court, on motion, permits the admission to be withdrawn or amended. Subject to Rule 16(e), the court may permit withdrawal or amendment if it would promote the presentation of the merits of the action and if the court is not persuaded that it would prejudice the requesting party in maintaining or defending the action on the merits.

Fed. R. Civ. P. 36(b).

As cause for the delay, Plaintiffs' counsel again cited the inconvenience of having to unexpectedly relocate his office. Lexington notes that this office relocation appears to have taken place more than 30 days *after* the answers to the requests for admission were due. This casts doubt on the excuse given by Plaintiffs' counsel. Nevertheless, the Court will give Plaintiffs' counsel the benefit of the doubt and presume that circumstances leading up to the move did, in fact, hamper his ability to respond to the discovery request.

Allowing Plaintiffs to withdraw their admissions will promote the presentation of the merits of the action and, as a general rule, the Court prefers to decide a case on its merits rather than on a technicality. More importantly, Lexington will suffer no prejudice. For the most part, the subject matter contained in the requests for admissions is superfluous because the same subject matter is covered in the deposition testimony of Dr. Leak, Melanie Leak and Meghan Leak. As discussed below, that deposition testimony conclusively establishes that there is no genuine issue of material fact with respect to the motions for summary judgment. The Court therefore grants Plaintiffs' motion for leave to respond to discovery out of rule and denies Lexington's motion to deem admitted the requests for admission.

## III. Motions for Summary Judgment

### A. Standard of Review

Although summary judgment should be cautiously invoked, it is an integral part of the Federal Rules, which are designed "to secure the just, speedy and inexpensive determination of every action." Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1). The standard for summary judgment is found in Federal Rule of Civil Procedure 56(c):

> [Summary judgment] . . . should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.

Summary judgment will be granted "only where the moving party is entitled to judgment as a matter of law, where it is quite clear what the truth is . . . [and where] no genuine issue remains for trial, . . . [for] the purpose of the rule is not to cut litigants off from their right of trial by jury if they really have issues to try." Poller v. Columbia Broadcasting Sys., 368 U.S. 464, 467 (1962) (quoting Sartor v. Arkansas Natural Gas Corp., 321 U.S. 620, 627 (1944)). See also Lansing Dairy, Inc. v. Espy, 39 F.3d 1339, 1347 (6th Cir. 1994).

Moreover, the purpose of the procedure is not to resolve factual issues, but to determine if there are genuine issues of fact to be tried. Lashlee v. Sumner, 570 F.2d 107, 111 (6th Cir. 1978). The court's duty is to determine only whether sufficient evidence has been presented to make the issue of fact a proper question for the jury; it does not weigh the evidence, judge the credibility of witnesses, or determine the truth of the matter. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986); Weaver v. Shadoan, 340 F.3d 398, 405 (6th Cir. 2003).

In a motion for summary judgment, the moving party bears the initial burden of showing that no genuine issue as to any material fact exists and that it is entitled to a judgment as a matter of law. Leary v. Daeschner, 349 F.3d 888, 897 (6th Cir. 2003). All the evidence and facts, as well as inferences to be drawn from the underlying facts, must be considered in the light most favorable to the party opposing the motion. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986); Wade v. Knoxville Util. Bd., 259 F.3d 452, 460 (6th Cir. 2001). Additionally, any "unexplained gaps" in materials submitted by the moving party, if pertinent to material issues of fact, justify denial of a motion for summary judgment. Adickes v. S.H. Kress & Co., 398 U.S. 144, 157-60 (1970).

"[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson, 477 U.S. at 247-48 (emphasis in original). A "material" fact is one that "would have [the] effect of establishing or refuting one of [the] essential elements of a cause of action or defense asserted by the parties, and would necessarily affect [the] application of [an] appropriate principle of law to the rights and obligations of the parties." Kendall v. Hoover Co., 751 F.2d 171, 174 (6th Cir. 1984). See also Anderson, 477 U.S. at 248. An issue of material fact is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248. See also Leary, 349 F.3d at 897.

If the moving party meets its burden, and adequate time for discovery has been provided, summary judgment is appropriate if the opposing party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will

bear the burden of proof at trial.  Celotex, 477 U.S. at 322.  The nonmoving party must demonstrate that "there is a genuine issue for trial," and  "cannot rest on her pleadings."  Hall v. Tollett, 128 F.3d 418, 422 (6th Cir. 1997).

> When a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must -- by affidavits or as otherwise provided in this rule -- set out specific facts showing a genuine issue for trial.  If the opposing party does not so respond, summary judgment should, if appropriate, be entered against that party.

Fed. R. Civ. P. 56(e).

The existence of a mere scintilla of evidence in support of the opposing party's position is insufficient; there must be evidence on which the jury could reasonably find for the opposing party.  Anderson, 477 U.S. at 252.  The nonmoving party must present "significant probative evidence" to demonstrate that "there is [more than] some metaphysical doubt as to the material facts."  Moore v. Phillip Morris Companies, Inc., 8 F.3d 335, 340 (6th Cir. 1993).  The court may, however, enter summary judgment if it concludes that a fair-minded jury could not return a verdict in favor of the nonmoving party based on the presented evidence.  Anderson, 477 U.S. at 251-52; Lansing Dairy, Inc., 39 F.3d at 1347.

**B.     Discussion**

As noted earlier, the relevant facts are largely undisputed.  Baugh-Ross's 180-day letters, addressed to Dr. Leak and PCCI, were delivered by certified mail to PCCI's office on November 28, 2005.  Melanie Leak signed the certified mail receipts as she was authorized to do.  (Melanie Leak Dep. at 11; Meghan Leak Dep. at 15-16, 51; Ex. 7 to Lexington's Mot. Summ. J.).  She testified that she put the letters on Dr. Leak's desk, (Melanie Leak Dep. at 11), but he does not

7

recall receiving them. (Dr. Leak Dep. at 33). Ms. Baugh-Ross filed suit on May 9, 2006.

It is undisputed that, during the relevant time period, Dr. Leak and PCCI were covered by professional liability insurance policies issued by Red Mountain Casualty Insurance Company and Lexington Insurance Company, and that all premiums had been paid in full. Red Mountain and Lexington nevertheless maintain that they have no duty to defend or indemnify with respect to Baugh-Ross's claim because that claim was not disclosed or reported in a timely manner.

### 1. Red Mountain's Policy

Red Mountain's policy was in effect from April 13, 2004 to April 13, 2006. (Karr Aff. ¶¶ 4-5; Ex. A to Red Mountain's Mot. Summ. J.). It was a "claims made" policy, which means it provided coverage only for claims made within the policy period. More specifically, a claim was covered only if:

> (1) The professional incident occurred on or after the retroactive date applicable to such insured;
> (2) The professional incident arises out of the insured's profession;
> (3) An assertion of liability is first reported during the policy period; and
> (4) The professional incident is first reported during the policy period.

(Ex. 1 to Karr Aff., p. 2). The policy also stated, "[w]hen any assertion of liability to which this insurance applies is made, the insured or his representative must report the professional incident which is the subject of the assertion of liability as soon as possible, but no later than 30 days thereafter." (Id. at p. 5).

It is undisputed that Plaintiffs failed to notify Red Mountain of their receipt of Baugh-Ross's 180-day letter prior to the cancellation of the policy. (Karr Aff. ¶ 7; Dr. Leak Dep. at 35-36, 38, 64-65). Plaintiffs did not report the "professional incident" until after Baugh-Ross filed

8

suit in May of 2006. By then, the policy had expired. Red Mountain argues that because the "professional incident" was not first reported during the policy period, there is no coverage, and it has no duty to defend or indemnify.

### 2. Lexington's Policy

Lexington's policy was effective April 13, 2006 to April 13, 2007 and had a retroactive date of April 13, 2004. When Dr. Leak signed his application for professional liability coverage through Lexington on April 13, 2006, he stated that he had no "knowledge of any incident or activity (including a request for patient records) that might give rise to a claim or suit in the future." (Ex. 1 to Lexington's Mot. Summ. J. at 30). Lexington's policy provided coverage only if:

> 4. the allegations made in the medical incident, claim, suit or any other patient-specific complaint were not previously known by you:
> 
>   a. due to a request for your medical records related to a medical incident; or
>   b. due to your receipt of a Notice of Intent or any similar legal document;
>   c. that were known to you because of any statement of proposed legal or regulatory action made by your patient or a member of their family.

(Ex. 2 to Lexington's Mot. Summ. J.)

Lexington argues that because, at the time Plaintiffs applied for insurance, Plaintiffs knew that Baugh-Ross was considering bringing a medical malpractice action against them, no coverage exists and Lexington has no duty to defend or indemnify.

9

### 3. Plaintiffs' Defense

Plaintiffs concede that they did not notify Red Mountain of the 180-day letters within 30 days of their receipt, and did not disclose Baugh-Ross's potential claim when they applied for insurance through Lexington. Plaintiffs argue, however, that these omissions should be excused since Dr. Leak and PCCI were not properly served with the 180-day letters pursuant to Ohio Revised Code § 2305.113 and had no actual knowledge of their existence.

The relevant statute reads as follows:

> (A) Except as otherwise provided in this section, an action upon a medical, dental, optometric, or chiropractic claim shall be commenced within one year after the cause of action accrued.
>
> (B)(1) If prior to the expiration of the one-year period specified in division (A) of this section, a claimant who allegedly possesses a medical, dental, optometric, or chiropractic claim *gives to the person who is the subject of that claim* written notice that the claimant is considering bringing an action upon that claim, that action may be commenced against the person notified at any time within one hundred eighty days after the notice is so given.

Ohio Revised Code § 2305.113 (emphasis added).

Plaintiffs maintain that the plain language of this statute requires actual service on the person who is the subject of the potential claim and does not allow service on an agent of that person. They contend that because Dr. Leak did not personally sign for the 180-day letters and had no actual knowledge of their existence, Plaintiffs' failure to report the potential claim to Defendants is excusable and does not negate Defendants' duty to defend and indemnify.

In support of this argument, Plaintiffs cite to two unpublished cases. In the first case, Jones v. St. Anthony Medical Center, No. 95APE08-1014, 1996 WL 70997 (Ohio Ct. App. 10th Dist. Feb. 20, 1996), plaintiff went to the emergency room at St. Anthony Medical Center where

10

Dr. Garcia diagnosed him with a sprained knee. It was later discovered that plaintiff's knee was fractured. Plaintiff sent Dr. Garcia a 180-day letter c/o Park Medical Center, formerly known as St. Anthony's. A mailroom employee signed the return receipt. At that time, Dr. Garcia was no longer on staff. Moreover, Dr. Garcia had never been an employee of St. Anthony's. Instead, he was employed by The Sterling Group which had a contract with St. Anthony's. Dr. Garcia denied receiving the 180-day letter and argued that the subsequent suit against him was time-barred. The court agreed, holding as follows

> In *Edens v. Barberton Area Family Practice Ctr.* (1989), 43 Ohio St.3d 176, syllabus, the Supreme Court held that a one hundred eighty-day letter is "given" once it is received. Although plaintiffs produced evidence that Dr. Garcia should have received the notice, such evidence does not create a genuine issue of material fact concerning Dr. Garcia's actual receipt of the notice. Plaintiffs must produce evidence that the notice was sent to and actually received by Dr. Garcia; proof that a hospital employee actually received the notice and may have forwarded it to Dr. Garcia remains insufficient. *State v. Durbin* (1992), 83 Ohio App.3d 156, citing *Edens, supra*, (interpreting R.C. 2913.11 notice and determining notice to intended recipient's employee was insufficient); see *Musser v. QHG of Ohio* (July 14, 1994), Franklin App. 94APE01-62, unreported (1994 Opinions 3153) (sending one hundred eighty-day notice to hospital facility where plaintiff was treated was insufficient to prove hospital's actual receipt because hospital's assets were sold after the alleged malpractice event). *Cf. Castellano v. Kosydar* (1975), 42 Ohio St.2d 107, *distinguished in Edens, supra* (when statute prescribes how notice could be given, service is effective when delivered and properly receipted by an appropriate person).

Jones, 1996 WL 70997, at *8.

The second case cited by Plaintiffs is Fulton v. Firelands Community Hospital, No. E-05-031, 2006 WL 1545712, 2006-Ohio-1119 (Ohio Ct. App. 6th Dist. Mar. 6, 2006). Plaintiff went to the emergency room at Fisher-Titus Medical Center on four separate occasions. Each time, he was seen by Dr. Murray or Dr. Thomas. Both doctors were employees of Norwalk Emergency

11

Medical Services, which contracted to provide emergency room services at Fisher-Titus. Murray and Thomas allegedly failed to properly diagnose his condition. Fulton sent 180-day letters via certified mail to Murray and Thomas c/o the Fisher-Titus Medical Center. Evelyn Bilger, an employee of Fisher-Titus, signed the certified mail receipts.

After Fulton filed suit, Murray and Thomas argued that because they had not been properly served with the 180-day letters, the statute of limitations was not extended. They had no recollection of receiving the 180-day letters and had no regular contact with the administrative offices at Fisher-Titus where Bilger was employed. The court agreed that, under these circumstances, the statute of limitations was not extended. It held that the 180-day statute "demands *actual receipt* of the 180-day letter by the intended recipient" prior to the expiration of the one-year statute of limitations period. Fulton, 2006-Ohio-1119, at ¶ 11 (construing Edens, 43 Ohio St. 3d 176). The Fulton court went on to state:

> This court and others have held that where actual receipt of a notice is required, receipt by the intended recipient's agent will not suffice. *State v. Durbin* (1992), 83 Ohio App.3d 156, 162, citing *Edens* (where statute proscribing the offense of passing bad checks requires that the offender receive notice of the check's dishonor, offender must actually receive the notice; receipt by the offender's employee does not satisfy the notice requirement); *Jones v. St. Anthony Med. Ctr.* (Feb. 20, 1996), 10th Dist. No. 95APE08-1014 (proof that a hospital employee actually received the 180-day letter and may have forwarded it to doctor is insufficient to create a genuine issue of material fact concerning the doctor's actual receipt of the notice).

Fulton, 2006-Ohio-1119, at ¶ 13.

### 4. Analysis

In their reply briefs, Defendants argue that because the 180-day letters were delivered via certified mail to Melanie Leak, an agent and employee of Dr. Leak and PCCI who was authorized to sign for certified mail, Plaintiffs are charged with notice of the potential claim. "'[T]he principal is chargeable with and bound by the knowledge of or notice to his agent received by the agent in due course of his employment, with reference to matters to which his authority extends.'" State ex rel. Nicodemus v. Industrial Comm'n 5 Ohio St.3d 58, 60, 448 N.E.2d 1360, 1362 (Ohio 1983) (quoting Raible v. Raydel, 162 Ohio St. 25, 29, 120 N.E.2d 425 (Ohio 1954)). Moreover, because Melanie Leak is an officer of PCCI, her knowledge of the receipt of the letters is imputed to the corporation. See Arcanum Nat'l Bank v. Hessler, 69 Ohio St.2d 549, 557, 433 N.E.2d 204, 211 (Ohio 1984).

The Court agrees that traditional agency principles apply and Plaintiffs are charged with notice of Baugh-Ross's 180-day letters. The two unreported cases cited by Plaintiffs are not binding on this Court, but even if they were, they are clearly distinguishable both factually and legally.

In Fulton and in Jones, the 180-day letters were delivered by certified mail to the hospitals where the doctors had treated the plaintiffs. The receipts were signed by hospital employees. Because these individuals were not employed by the doctors or by the medical corporations that employed the doctors, they were not the doctors' agents. Therefore, there was no need to consider whether traditional agency principles applied. In stark contrast, not only was Melanie Leak an employee of PCCI and Dr. Leak's wife, she was also an officer of PCCI and was specifically authorized to sign for certified mail on behalf of Plaintiffs.

Fulton and Jones are also legally distinguishable. The issue in those cases was whether

13

the statute of limitations set forth in Ohio Revised Code § 2305.113 was effectively extended even though the doctors failed to receive actual notice of the 180-day letters. In contrast, the issue in this case is whether Melanie Leak's receipt of the 180-day letters can be imputed to Dr. Leak and PCCI for the purpose of determining whether their contractual obligation to notify their insurance companies of Baugh-Ross's potential claim was triggered. Case law interpreting Ohio Revised Code § 2305.113 is inapposite with respect to this issue.[2]

In short, there is no reason to believe that traditional agency principles do not apply to the question of whether Dr. Leak and PCCI can be charged with knowledge of Baugh-Ross's potential claim. In this case, Melanie Leak's receipt of the 180-day letters must be imputed to Dr. Leak and to PCCI. Because they failed to give Defendants timely notice of claim as specifically required by the insurance contracts, Defendants have no duty to defend or indemnify and are entitled to summary judgment as a matter of law.

---

[2] Moreover, even if these cases were on point, the Court notes that, in Jones, the court of appeals impliedly acknowledged that receipt of a 180-day letter by an authorized agent would be sufficient to extend the statute of limitations:
> Further, to the extent plaintiffs argue the Park Medical Center mailroom employee was acting as Dr. Garcia's agent, they failed to produce evidence establishing actual or apparent agency. *Gardner Plumbing v. Cottrill* (1975), 44 Ohio St.2d 111, 115. Without proving an agency relationship, plaintiffs cannot sustain their burden that Dr. Garcia or his agent actually received the notice. *See Nye v. Kemp* (1994), 97 Ohio App.3d 130, 135 (crucial element of agency is control); *Johnson v. Tansky Sawmill Toyota, Inc.* (1994), 95 Ohio App.3d 164, 168 (standard for apparent agency).

Jones, 1996 WL 70997, at *8.

## IV. Conclusion

For the reasons stated above, Plaintiffs' motion for leave to file discovery responses (Doc. 64) is **GRANTED** and Lexington's motion to deem the First Set of Requests for Admission admitted (Doc. 60) is **DENIED**. Because there is no genuine issue of material fact and Defendants are entitled to judgment as a matter of law, the Court **GRANTS** Defendants' motions for summary judgment (Doc. 46, 61). The Clerk is directed to enter judgment in favor of Defendants.

**IT IS SO ORDERED.**

Date: July 24, 2009            **/s/ John D. Holschuh**
                               John D. Holschuh, Judge
                               United States District Court